No. 97-318

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 307

ANDREW and SUSANNA KELLY,

Plaintiffs, Appellants, and Cross-Respondents,

v.

JAMES B. WALLACE; JOHN C. WALLACE, Trustee of the

John C. Wallace Revocable Trust; JAN JANURA and CAROL M.

ANDERSON, and BRYAN S. FINKLE, Trustee, or the Successor

Trustee of the Finkle Living Trust, U/A/D 2/28/89,

Defendants, Respondents, and Cross-Appellants.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Madison,

The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

James H. Goetz, Brian K. Gallik, and Robert K. Baldwin;

Goetz, Gallik, Baldwin & Dolan, P.C.; Bozeman, Montana

For Respondents:

J. Robert Planalp; Landoe, Brown, Planalp & Braaksma, P.C.;

Bozeman, Montana (for Wallaces)

Michael J. Lilly; Berg, Lilly, Andriolo & Tollefsen;

Bozeman, Montana (for Janura and Anderson)

James A. McLean; Drysdale, McLean & Nellen; Bozeman, Montana

(for Finkle)

Submitted on Briefs: September 10, 1998

Decided: December 15, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. The plaintiffs, Andrew and Susanna Kelly, commenced this action for declaratory judgment in the District Court for the Fifth Judicial District in Madison County. They sought a determination of their rights in and to a bridge and road which provided access to their property. After a nonjury trial, the District Court held that Kellys were part owners of the bridge and have a limited easement by prescription over the road. Kellys appeal from that judgment. The defendants, James B. Wallace and John C. Wallace, have cross-appealed. We affirm the judgment of the District Court.**

**¶2. The parties raise five issues on appeal:**

**¶3. 1. Did the District Court err when it defined the scope of Kellys' prescriptive easement?**

**¶4. 2. Did the District Court err when it denied Kellys' claim of a general easement by estoppel?**

**¶5. 3. Did the District Court err when it denied Kellys' claim for a general easement by grant or reservation?**

¶6. 4. Did the District Court err when it concluded that Kellys were equal owners of the bridge with Wallaces and Finkle?

¶7. 5. Should the District Court's judgment be amended to avoid confusion about purposes for which the easement can be used in the future?

## FACTUAL BACKGROUND

¶8. In 1958, Andrew and Susanna Kelly purchased a ranch in Madison County consisting of approximately 3200 acres. At the time of their purchase, there were two roads which provided access to the ranch. The primary road, including a bridge over the Madison River, had been built by Kellys' predecessor in interest over what was then the Sun Ranch and the Shelton Ranch to provide access from U.S. Highway 287; neither Kellys nor their predecessors had a written grant from the other property owners for use of the road. A county road also provided access to Kellys' ranch, although it was poorly maintained and impassable in winter.

¶9. Kellys and their three children lived on the ranch property and made substantial improvements to it, including the construction of a second residence, sheds, and corrals. They employed a number of people in their operation of the ranch, several of whom lived on the ranch. They used the primary road and bridge for traditional ranch operations, such as the transport of livestock, crops, and machinery, and for normal social and recreational purposes of Kellys and their guests. Kellys maintained and improved the primary road throughout their use, and residents of the area have consistently referred to the road as "Kellys' Road" and directed outsiders to Kellys for permission to use it. During what the court determined was the period of acquisition, Kellys did not use the road and bridge for any commercial purpose, other than their family ranch business. They conducted no logging, mining, or commercial guiding on the property.

¶10. The District Court found that through their open and notorious use of the road and bridge during the five-year period from 1958 to 1963, Kellys acquired a prescriptive easement over the neighboring properties.

¶11. In 1964, Kellys, along with the defendants' predecessors in interest and other neighbors, petitioned Madison County to close part of the county road. In reliance on the alternate access provided by the primary road, the petitioners told the county

that the county road was "not necessary for the . . . residents of this district." Madison County closed part of the county road pursuant to the petitioners' request, and eventually other parts of the road were closed as well.

¶12. Kellys replaced the bridge in 1972 at an expense of several thousand dollars. They did not receive prior permission from the owners of the Sun Ranch, on whose property both ends of the bridge sat, but the owners of the Sun Ranch provided some assistance to Kellys during the project. Kellys thereafter posted "No Trespassing" signs on the bridge and maintained and repaired it. Residents of the area referred to the bridge as the "Kelly Bridge," and Kellys have throughout the years monitored the bridge's use and maintained and repaired it.

¶13. In 1973, Kellys acquired a second ranch property in Madison County. They transferred their residence to the second ranch and thereafter operated the original ranch during only part of the year. Kellys' use of the road and bridge lessened as a result, but they, their employees, and their guests continued to use the road for access to the ranch.

¶14. In January and February 1979, a series of certificates of surveys were filed in Madison County by the defendants' predecessors in interest.

¶15. COS 237 portrayed a subdivision of nine tracts and depicted two easements, one of which conformed to Kellys' easement, that were designed to provide access to the different tracts. The easements extended to the neighboring property, which is labeled "unplatted," although no dominant tenement is identified. Language on the certificate described the property, "subject to all existing easements, and in particular, sixty foot access and utility easements as depicted on the hereunto affixed plat." All of the land depicted on COS 237 is now owned by defendants John C. and James Wallace.

¶16. COS 238 portrayed a subdivision of five tracts and depicted two easements, one of which conformed to that portion of Kellys' easement that runs from U.S. Highway 287 to the east bank of the Madison River where the bridge begins. The bridge is not marked, and the surrounding property is labeled "unplatted." The certificate included virtually the same language as was quoted above on COS 237. One of the tracts included on COS 238 is now owned by defendant Bryan Finkle.

¶17. Finally, COS 250 portrayed a fifty-eight tract subdivision. Multiple easements are depicted with the clear intent to serve as primary roads for access to the various tracts within the subdivision. Many of the easements conform to Kellys' easement and extend to Kellys' neighboring property. The surrounding property is labeled "unplatted," and no dominant tenement is described; there is no other express language on the survey. The land depicted on COS 250 is now owned by defendants Jan Janura and Carol M. Anderson.

¶18. The District Court found that there was no language or any other evidence in any of the certificates that indicated an intent to reserve a sixty-foot wide access and utility easement for Kellys.

¶19. On June 4, 1979, defendants John and James Wallace acquired all of the undivided property described in COS 237 by a deed which stated that the conveyance was made "subject to . . . all easements, rights-of-way and rights-of-way for roads, ditches and utilities and conditions shown by a physical examination of the property or as shown on the [COS] to the above-described property." The property runs along the west bank of the Madison River and is connected to the west bank by the bridge in question. Wallaces did not receive a bill of sale or any other written grant to indicate an interest in the bridge, nor did they receive a written easement over any other portion of the access road.

¶20. On April 26, 1988, defendant Finkle acquired one of the tracts described on COS 238. The property runs along the east bank of the Madison River and is bordered on the east by U.S. Highway 287. Finkle does not use the access road from the highway over anything but his own property.

¶21. On July 6, 1993, defendants Janura and Anderson acquired all fifty-eight tracts depicted in COS 250. The property was described in part by reference to COS 250. It is located west of Wallaces' property and east of Kellys' property. The conveyance was made "subject to . . . easements for utilities, ditches, streams, canals, and roads or highways as they may be located over, along and across the subject property, now of record or apparent from physical examination and inspection of the premises." They did not receive any written interest in either the bridge or the access road. Janura and Anderson remain the owners of all fifty-eight tracts, but, in 1994, they placed a conservation easement on fifty-three of the tracts. The effect of the easement was to limit their development on the tracts to two homes and six sleeping cabins in

consideration for a federal income tax deduction.

¶22. Kellys, Wallaces, and Janura and Anderson all use the bridge and access road to reach their property. None of the defendants have ever interfered with Kellys' use of the road or the bridge.

¶23. In 1995, Kellys permitted a movie to be filmed on their ranch. The movie company allegedly damaged the bridge, and Wallaces and Kellys disputed who should be responsible for the alleged damage. Kellys responded by filing a claim for declaratory, injunctive, and other equitable relief in the District Court for the Fifth Judicial District in Madison County. They sought a declaration of their right to use the bridge and the access road over the defendants' property. Kellys amended their complaint in October 1995 to seek a declaration of their right to a sixty-foot easement for unlimited use. Defendants eventually acknowledged the existence of the easement but denied that it could be used for any purpose.

¶24. After a three-day trial in January 1997, the District Court found that Kellys had acquired a prescriptive easement over the access road and bridge; it rejected Kellys' claims of an easement by grant or estoppel. Based on the width established during the period of acquisition, the District Court concluded that Kellys' easement varied from twelve to thirty feet, as defined by the existing roadbed, fences, and ditches. Its scope was further defined by the nature of Kellys' use during the period of acquisition and, therefore, was limited to traditional ranching operations, noncommercial social and recreational activities, regular maintenance and repair, and "other uses normally associated with a working family ranch that do not significantly increase the burden on the servient estates."

¶25. The District Court also held that future subdivision of the land, as well as "logging, mining, guiding or outfitting, or commercial film making, could arguably significantly impact and increase the burden on the servient estates." Finally, the District Court concluded that Kellys were entitled to a declaratory judgment that they co-own the bridge with Finkle and Wallaces, to whose land the bridge is attached, but that judgment is enforceable against only the defendants in this case.

ISSUE 1

¶26. Did the District Court err when it defined the scope of Kellys' prescriptive

easement?

¶27. We review a district court's conclusions of law to determine whether they are correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686; *see also Kreger v. Francis* (1995), 271 Mont. 444, 447, 898 P.2d 672, 674; *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-04. We review a district court's findings of fact to determine whether they are clearly erroneous. *See Interstate Prod. Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287.

¶28. The defendants stipulated that Kellys own a prescriptive easement over the access road and bridge. The District Court nonetheless found that Kellys established their right to a prescriptive easement by using the road from the time that they acquired the ranch through the five-year statutory period. Based on the easement, the District Court also recognized a "secondary easement to enter Defendants' properties at all reasonable times to construct, repair and maintain their primary easement as necessary for their enjoyment of it, so long as that entry does not needlessly increase the burden on Defendants' properties." Based upon the nature of their use of the road during the prescriptive period of 1958-1963, the District Court concluded that Kellys' easement encompassed only general ranching and residential uses. It also recognized that Kellys expanded their easement during a second prescriptive period to include access over twelve to thirty feet of road. Kellys contend that the District Court erred by limiting their use of the easement in this fashion.

¶29. First, Kellys claim that the District Court misapplied § 70-17-106, MCA, which states that "[t]he extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired." The District Court concluded in reliance on the statute that Kellys' use of the road for only general ranching and residential uses during the initial prescriptive period defined the extent of the easement that they acquired by prescription. It therefore held that Kellys were prohibited from using the road for commercial uses, such as logging, mining, and guiding, and for subdivision access, since Kellys did not engage those uses during the prescriptive period.

¶30. Kellys assert that the statute should not be strictly applied. Their primary authority is a 1902 Massachusetts case, which, in reference to horse-drawn carriages, explained that "one must generalize to some extent" when determining the extent of

the easement rights acquired by prescription. *See generally Baldwin v. Boston & M.R. R.* (Mass. 1902), 63 N.E. 428. We are not persuaded by this limited authority.

¶31. The fact remains that this Court has never wavered in its interpretation of § 70-17-706, MCA. We have always held that the statute limits owners of a prescriptive easement to the use that was established during the prescriptive period. *See Leffingwell Ranch, Inc. v. Cieri* (1996), 276 Mont. 421, 430-31, 916 P.2d 751, 758; *Ruana v. Grigonis* (1996), 275 Mont. 441, 454, 913 P.2d 1247, 1255; *Warnack v. Coneen Family Trust* (1994), 266 Mont. 203, 217-18, 879 P.2d 715, 724; *Lindley v. Maggert* (1982), 198 Mont. 197, 199, 645 P.2d 430, 432; *Marta v. Smith* (1981), 191 Mont. 179, 183, 622 P.2d 1011, 1013; *State v. Cronin* (1978), 179 Mont. 481, 490, 587 P.2d 395, 401; *Hayden v. Snowden* (1978), 176 Mont. 169, 175, 576 P.2d 1115, 1119; *O'Connor v. Brodie* (1969), 153 Mont. 129, 136, 454 P.2d 920, 924; *State v. Portmann* (1967), 149 Mont. 91, 96, 423 P.2d 56, 58; *Ferguson v. Standley* (1931), 89 Mont. 489, 502, 300 P. 245, 250; *Lowry v. Carrier* (1918), 55 Mont. 392, 398, 177 P. 756, 758; *McDonnell v. Huffine* (1912), 44 Mont. 411, 427, 120 P. 792, 796-97. We see no reason to alter our application of § 70-17-706, MCA, based on the facts in this case.

¶32. Kellys also contend that the District Court misapplied the statute when it limited the frequency of Kellys' use pursuant to the statutory language which limits the easement only by the "nature of their enjoyment." Kellys assume there is a difference between character of use and frequency of use, and that the statute prohibits only changes in the former.

¶33. However, we noted in *Cieri* that a substantial increase in traffic can constitute an impermissible expansion of easement rights. *See Cieri*, 276 Mont. at 431, 916 P.2d at 757. We held there that easement owners could not broaden their use to include subdivision access because the use was "not contemplated by the original parties to the easements, would be inconsistent with the historical use of the easements, and would constitute an improper burdening of those easements." *Cieri*, 276 Mont. at 432-33, 916 P.2d at 758. *Cronin* also addressed concerns about the expansion of easements to include subdivision use by stating that the easement was "governed by the character of the use made during the prescriptive period and should not exceed the greatest use then enjoyed." *Cronin*, 179 Mont. at 490, 587 P.2d at 401.

¶34. The phrase "nature of enjoyment" therefore includes the frequency with which the easement was enjoyed. Accordingly, we hold that the frequency of use by which

owners of an easement by prescription acquired their easement during the prescriptive period may limit the frequency of future use pursuant to § 70-17-706, MCA.

¶35. Based on these conclusions, we hold that the District Court did not err in its application of § 70-17-706, MCA, and its conclusion that Kellys' prescriptive easement is limited to uses made by Kellys and by the relative burden on the defendants' property during the prescriptive period.

¶36. Kellys urge this Court to adopt §§ 478 and 479 of the Restatement of Property to permit the expansion of the rights they originally acquired. Section 479 provides that "[i]n ascertaining whether a particular use is permissible under an easement . . . created by prescription there must be considered . . . the needs which result from a normal evolution in the use of the dominant tenement."

¶37. In *Warnack*, 278 Mont. at 86, 923 P.2d at 1091, we specifically rejected a party's suggestion that we adopt "an evolutionary approach . . . in prescriptive easement cases to allow greater use of the easement over time." We declined the request to adopt §§ 478 and 479 of the Restatement and held that "[t]he rule expressed in *Marta* and *Ruana* accurately reflects the scope of prescriptive easements in Montana." *Warnack*, 278 Mont. at 87, 923 P.2d at 1091. *Ruana* and *Marta* represent the long-standing rule in Montana that the right to use an easement acquired by prescription cannot exceed the use which was made during the prescriptive period. *See Ruana*, 275 Mont. at 454, 913 P.2d at 1255; *Marta*, 191 Mont. at 183, 622 P.2d at 1013.

¶38. We do not agree with Kellys' argument that the result in this case is so "fundamentally unfair" that we should reconsider our prior rejection of §§ 478 and 479.

ISSUE 2

¶39. Did the District Court err when it denied Kellys' claim of a general easement by estoppel?

¶40. "Equitable estoppel is not favored and will be sustained only upon clear and convincing evidence." *Ducham v. Tuma* (1994), 265 Mont. 436, 441, 877 P.2d 1002, 1006; *see also Dagel v. City of Great Falls* (1991), 250 Mont. 224, 235, 819 P.2d 186,

**193. A party must demonstrate six essential elements to satisfy the doctrine of equitable estoppel:**

(1) there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it in such a manner as to change his position for the worse.

*Dagel*, 250 Mont. at 234-35, 819 P.2d at 192-93; *see also Ducham*, 265 Mont. at 441-42, 877 P.2d at 1006; *Kephart v. Portmann* (1993), 259 Mont. 232, 237, 855 P.2d 120, 123. *The rule is designed to prevent one party from suffering a gross wrong at the hands of another party who has brought about the condition. See Kenneth D. Collins Agency v. Hagerott* (1984), 211 Mont. 303, 310, 684 P.2d 487, 490; *Hostetter v. Inland Dev. Corp. of Montana* (1977), 172 Mont. 167, 175-76, 561 P.2d 1323, 1328.

**¶41. Kellys assert that they are entitled to an easement by estoppel with rights as broad as the ones they abandoned when the county road was closed. They assert that when the defendants' predecessors joined them in the petition to close the county road on the basis that it was not necessary for access to Kellys' property, a representation was made that the access road could be used to the same extent as the county road. They contend that in light of this representation by the defendants' predecessors in interest, it would be unjust for Kellys to be denied general access over the defendants' property.**

**¶42. Defendants, on the other hand, deny that the petition that stated that the county road was no longer necessary was a representation that the easement could be used for any purpose. The District Court agreed with defendants and denied the easement by estoppel, based on its conclusion that "[t]he fact of the petition alone . . . should not be construed as a 'representation of material fact.'" It also found that there was no evidence that the defendants' predecessors in interest had done anything that would entitle Kellys "to believe they had an easement of the same size and scope over Defendants' predecessors' properties as the county road." Our review of the record leads us to the same conclusions.**

¶43. Equitable estoppel is based on the principle that a party cannot, through his intentional "conduct, actions, language, or silence," induce another party to unknowingly and detrimentally alter his position and then subsequently deny the just and legal consequences of his intentional acts. For that reason, an equitable estoppel claim rests on the concealment or representation of facts by the estopped party. *See In re Marriage of K.E.V.* (1994), 267 Mont. 323, 332, 883 P.2d 1246, 1252. The party who asserts equitable estoppel as the basis of its claim bears the affirmative burden of proving the elements of estoppel. *See O'Neill v. Wall* (1936), 103 Mont. 388, 399, 62 P.2d 672, 677; *see also Cedar Creek Oil & Gas Co. v. Fidelity Gas Co.* (9th Cir. 1957), 249 F.2d 277, 281; *E.F. Matelich Constr. Co. v. Goodfellow Bros., Inc.* (1985), 217 Mont. 29, 33, 702 P.2d 967, 969.

¶44. The petition which Kellys rely on to establish their claim stated that the residents of the area, including Kellys, felt that the county road "was no longer necessary." Kellys contend that this language recognizes an easement equivalent to the county road. We agree with the District Court that the language cannot be interpreted so expansively. There is nothing in the petition to suggest that the parties to the petition anticipated any greater use of the private road than the use to which it was being put at the time the petition was submitted.

¶45. There is no evidence that the defendants' predecessors in interest promised a sixty-foot general easement, nor that the residents who submitted the petition could be assured that they would retain county road-like access. Kellys counter that "[t] here is simply no evidence that [they], being reasonable people, would sign away such rights unless they understood their access on the Road afforded them comparable access." As stated above, however, the burden rests on Kellys to establish an estoppel. It was not the defendants' burden to explain the petition for county road closure. As the District Court found, the defendants' predecessors in interest did nothing that would entitle Kellys to believe that they could consider the access road as though it was either at the time or in the future available for their unlimited use. Accordingly, we affirm the District Court's denial of Kellys' claim to a sixty-foot-wide general easement by estoppel.

ISSUE 3

¶46. Did the District Court err when it denied Kellys' claim of a general easement by grant or reservation?

¶47. Kellys assert that the references to an easement in the deeds of conveyance between the defendants' predecessors in interest and the defendants are effective as a matter of law to reserve a sixty-foot general easement in Kellys' favor.

¶48. An easement by reservation may be established by reference in a document of conveyance to a recorded COS which adequately describes the easement. *See Halverson v. Turner* (1994), 268 Mont. 168, 885 P.2d 1285; *Bache v. Owens* (1994), 267 Mont. 279, 883 P.2d 817. However, in both *Halverson* and *Bache*, the easement recognized benefited land retained by one of the parties to the conveyance after they divided and sold a portion of the land that they had previously held in single ownership. Therefore, creation of an easement by reservation in the above manner requires that the grantor be a party to the conveyance and that he intend to reserve his own previously-held right to use the servient estate after he sells the divided parcel. That is not the case here and, therefore, *Halverson* and *Bache* do not apply.

¶49. Kellys are strangers to the conveyances who assert that they were intended to benefit from the references to the easement. We held in *Medhus v. Dutter* (1979), 184 Mont. 437, 444, 603 P.2d 669, 673, that "an easement cannot be created in favor of a stranger to the deed." In the same discussion, however, we noted that where intent can be clearly shown, "we will depart from that rule to give effect to the grantor's intent." *Medhus*, 184 Mont. at 444, 603 P.2d at 673. We then listed four factors to be considered in a determination of the grantor's intent. They include:

[1] the express language of the deed; [2] testimony by grantors stating their intent; [3] the fact that the grantor received less value for the property conveyed because of the existence of an easement; and, [4] the sufficiency of the description of the location of the easement and whether or not the reservation names a dominant tenement.

*Medhus, 184 Mont. at 444, 603 P.2d at 673 (citations omitted).*

¶50. The District Court considered the four factors and found that there was no testimony from defendants' predecessors in interest regarding their intent, nor was there any evidence to establish that the value of defendants' property was diminished by Kellys' alleged easement. In addition, none of the documents expressly refer to Kellys' land as the dominant tenement. None of those findings have been challenged by Kellys.

¶51. Kellys' sole argument in opposition to the District Court's decision regarding the conveyances appears to be that it erred when it found that the language of the conveyances did not create an easement in their favor. The conveyances described defendants' property and each used substantially the same language conveying the property "subject to existing easements, and in particular, sixty foot access and utility easements as depicted on the hereunto affixed plat." It is well-established that "subject to" language in a conveyance does not create an easement. *See Wild River v. Board of Trustees* (1991), 248 Mont. 397, 401, 812 P.2d 344, 346; *see also Ruana*, 275 Mont. at 449, 913 P.2d at 1252. We have held that even where a conveyance describes an easement in detail, as in this case, the words "subject to" in their ordinary use do not create or reserve easement rights in favor of a stranger to a deed. *See Ruana*, 275 Mont. at 449, 913 P.2d at 1252-53. Accordingly, the language on the conveyances, even in combination with the express depiction of the easement, is not sufficient in and of itself to demonstrate the grantor's intent to create an easement for Kellys' benefit.

¶52. Accordingly, we conclude that the District Court did not err when it found that Kellys failed to show that the defendants' predecessors in interest intended to grant Kellys an easement.

¶53. Kellys assert on appeal that this Court should disregard the *Medhus* factors for demonstrating intent in favor of general contract principles that look just to the "circumstances under which [the conveyance] was made." Section 28-3-402, MCA. They rely on § 70-1-521, MCA, which states that "[a] present interest and the benefit of a condition or covenant respecting property may be taken by any natural person under a grant although not named a party thereto." They contend that if we take a more general view of the circumstances at the time of the conveyances, the grantors' intent to reserve an easement to Kellys' benefit is obvious.

¶54. We note first that there is no dispute here about whether nonparties to a conveyance can benefit from a transfer. In fact, we clearly acknowledged in *Medhus* that in cases where intent can be shown, we will give effect to the grantor's intent to benefit a nonparty to the transfer. *See also Ruana*, 275 Mont. at 449, 913 P.2d at 1252-53. Therefore, the District Court's decision is consistent with § 70-1-521, MCA. The *Medhus* factors apply by design to situations, such as presented in this case, where a stranger to a conveyance asserts property rights pursuant to the transfer. Moreover, the purpose of the *Medhus* factors is to impose a consistent standard by which intent

can be discerned without resorting to broad and subjective speculation. We reaffirm the applicability of the *Medhus* factors and affirm the District Court's conclusion based on those factors that Kellys did not have an easement by conveyance or grant.

## ISSUE 4

¶55. Did the District Court err when it concluded that Kellys were equal owners of the bridge with Wallaces and Finkle?

¶56. Kellys contend that they should have been declared sole owners of the bridge. They rely on the uncontested evidence that Kellys purchased the bridge and received a bill of sale for the bridge when they acquired the ranch in 1958, and on the fact that they essentially rebuilt the bridge and maintained control over it. They therefore contend that the District Court erred when it awarded Wallaces and Finkle an ownership interest in the bridge, even though they had not paid Kellys any consideration.

¶57. The District Court based its decision on the principle that "[a] bridge is of necessity affixed to the realty and is real estate--as much real estate as the remainder of the highway of which it is a part." *State ex rel Donlan v. Board of Commissioners* (1914), 49 Mont. 517, 523, 143 P. 984, 985. It further stated that "[w]hen a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed . . . belongs to the owner of the land unless he chooses to require the former to remove it." Section 70-18-101, MCA.

¶58. Kellys do not challenge the District Court's findings of fact regarding the location of the bridge, but claim that § 70-18-101, MCA, is inapplicable because the "pilings and abutments" of the bridge rest in and on the stream bed of the Madison River which is owned by the State of Montana. This finding, however, is not inconsistent with the District Court's premise that the bridge is attached to the property of both Wallaces and Finkle.

¶59. No persuasive argument having been made to the contrary, we affirm the District Court's assignment of ownership of the bridge.

## ISSUE 5

¶60. Should the District Court's judgment be amended to avoid confusion about purposes for which the easement can be used in the future?

¶61. In its conclusion regarding Kellys' easement, the District Court stated that although it "can define the scope and extent of Plaintiffs' easement as it has done herein [pursuant to their use during the prescriptive periods], it cannot declare judgment for or against possible future uses of the easement that are purely speculative in nature." Wallaces cross-appeal to request that this Court direct an amendment to the judgment so as to "specifically indicat[e] that subdivision, installation of utilities, logging or mining are not permitted uses within the scope of the adjudicated easement."

¶62. Kellys initiated this case seeking a declaration of their rights in the bridge and access road. To the extent that the District Court's decision specifically limits what uses Kellys may make of the easement based upon their use during the prescriptive period, it has resolved the issue presented to it. Were we to oblige Wallaces' cross-appeal and specifically foreclose speculative future uses, we would be overreaching our role as a court of appeals that considers only whether the District Court has erred in its decision. Wallaces make no such contention of error, but rather, seek a more restrictive holding than the holding of the District Court. We are not in a position to provide one.

¶63. Accordingly, we deny Wallaces' cross-appeal and affirm the District Court's judgment.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ WILLIAM E. HUNT, SR.